CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA
August 02, 2024
LAURA A. AUSTIN, CLERK
BY: KRISTIN AYERSMAN
   DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA, INC., *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>THOMAS JEFFERSON CROSSINGS HOMEOWNERS' ASSOCIATION, INC., *et al.*,<br><br>*Defendants*. | CASE NO. 6:23-cv-00048<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW<br><br>JUDGE NORMAN K. MOON |

This case comes to the Court on Plaintiffs' motion to enforce the judgment. Plaintiffs—Housing Opportunities Made Equal of Virginia, Inc.; Mansour Etemadipour; Judith Etemadipour; Nick Etemadipour; and Kelly Koppenal—sued Defendant Thomas Jefferson Crossings Homeowners' Association, Inc. and Defendant Priority One Properties, LLC for housing discrimination. Before trial, however, the parties agreed to and signed a settlement agreement. The proper interpretation of that agreement is the gravamen of the present dispute. Specifically, the parties debate whether the settlement agreement required Defendant Priority One to purchase Plaintiffs' homes by January 11, 2024. Determining that the parties have reached a valid settlement agreement that unambiguously identifies January 11, 2024 as the closing date, the Court will grant Plaintiffs' motion and award damages.

### APPLICABLE LAW

Court-facilitated settlements are "an important aspect of the judicial process"; they support the timely, "orderly and peaceful" resolution of cases on courts' dockets. *Hensley v.*

1

*Alcon Labs., Inc.*, 277 F.3d 535, 540 (4th Cir. 2002). Further, "[i]t is well settled that a district court retains inherent jurisdiction and equitable power to enforce agreements entered into in settlement of litigation before that court." *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983). But that power extends only to "complete settlement agreements." *Id.* "[W]here there was never a meeting of the minds," a district court has no power to impose a settlement agreement where none otherwise existed. *Id.* In other words, absent agreement to resolve a case, "a party may demand and receive full judicial process, including trial, for the resolution of legitimate disputes." *Hensley*, 277 F.3d at 540.

Enforcement of a settlement agreement proceeds in two steps: (1) "the court should ascertain whether the parties have in fact agreed to settle the case," and, if they have, (2) "then the court must discern the terms of that settlement." *Moore v. Beaufort County, N.C.*, 936 F.2d 159, 162 (4th Cir. 1991). "In deciding whether a settlement agreement has been reached, the Court looks to the objectively manifested intentions of the parties." *Id.*

"If there is a factual dispute over the existence of [a] [settlement] agreement, over the authority of the attorneys to enter into the agreement, or over the agreement's terms, the district court may not enforce a settlement agreement *summarily*." *Hensley*, 277 F.3d at 541. Rather, "when such factual disputes arise, the court must conduct a plenary evidentiary hearing in order to resolve that dispute." *Id.* (internal quotation marks and citation omitted).

## POSTURE

In accordance with *Hensley*, 277 F.3d at 541, the Court convened a plenary evidentiary hearing, Dkt. 49 (Minute Entry); Dkt. 62 (Minute Entry); the parties submitted documentary evidence in anticipation of the hearing, *see* Dkts. 38, 43, 46, 61; the Court considered evidence adduced at the evidentiary hearing, Dkt. 50 (Exhibit List); Dkt. 63 (Same); and upon the Court's

direction, the parties submitted proposed findings of fact and conclusions of law, Dkts. 47, 48. This matter is now ripe for disposition.

## FINDINGS OF FACT

In March 2023, Plaintiffs—Housing Opportunities Made Equal of Virginia, Inc.; Mansour Etemadipour; Judith Etemadipour; Nick Etemadipour; and Kelly Koppenal—sued Defendant Thomas Jefferson Crossings Homeowners' Association, Inc. and Defendant Priority One Properties, LLC for housing discrimination. Dkt. 1. The present lawsuit was one of four suits between the parties—legal actions that spanned both state and federal court. Dkt. 38 at 1.

Before trial in the above-captioned matter, the parties expressed an "interest[] in pursuing mediation," and accordingly, the Court referred this case—and the related cases—to "mediation before United States Magistrate Judge C. Kailani Memmer." Dkt. 29. Mediation occurred on November 2, 2023, and "[a]s a result of the mediation proceedings," Dkt. 34, the parties agreed to a memorandum of understanding (hereinafter "MOU"), resolving all the cases between them, *see* Dkt. 38 (Ex. 1) (Memorandum of Understanding); *see also id.* (Ex. 2) (Settlement Agreement) ¶ 1 ("The purpose of this Settlement Agreement and Release is to resolve forever any and all claims that have been asserted or that could have been asserted by any party to the actions…"). The MOU was then incorporated into a formal settlement agreement, which was signed by the parties. *Id.* (Ex. 2). Upon notice that the parties had settled, the trial was cancelled. Dkt. 36. At that point, this matter should have been resolved.

But subsequently, a new dispute arose—a dispute centering around Defendant Priority One's alleged breach of the settlement agreement. As a part of the settlement, Defendant Priority One agreed to purchase "the Etemadipour Family's properties"—1060, 1072, and 1080

Governor's Lane. *Id.* (Ex. 2) ¶ 3. Relevant here, the settlement agreement stated that closing on those properties should "be completed on or before January 11, 2024."[1] Dkt. 38 (Ex. 2) ¶ 3.

Relying on the clear contractual language in the settlement agreement, the Etemadipour Family "proceeded to make an offer and arrange a closing on [two new] home[s]," Dkt. 38 at 2: 203 Longhill Road, Goode, VA 24556, Dkt. 63 (Pl. Ex. 22), and 1395 Wilson Drive, Goode, VA 24556, *id.* (Pl. Ex. 46). The closings for these two homes were scheduled for shortly "after the January 11 closings specified in the Settlement Agreement." Dkt. 38 at 2; Dkt. 63 (Pl. Ex. 22) at 3; *id.* (Pl. Ex. 46) at 3.

But Defendant Priority One failed to close on January 11, 2024. The company stated that it believed that it had until February 15, 2024 to close on the Etemadipours' homes; indeed, it insisted that the settlement agreement states that it must "purchase [the] three properties owned by the Plaintiffs ("properties") within sixty (60) days of *the ratification of the Settlement Agreement and Release*"—a proposition contradicted by the plain language of the settlement agreement.[2] Dkt. 43 at 2 (emphasis added). Nevertheless, in accordance with this view, on December 28, 2023, Defendant informed Plaintiffs—for the first time—that "the properties will not close on the 10th of January 2024 (sic)." *Id.* at 11. The company also sent Plaintiffs a purchase agreement, proposing a February 29, 2024 closing date. Dkt. 38 (Ex. 4) at 3.

---

[1] The Court notes that the MOU initially provided that closing on the properties should occur "within sixty (60) days of [the signing of the MOU]"—i.e., by January 1, 2024. Dkt. 38 (Ex. 1) ¶ 14. But while negotiating the settlement agreement, the parties "agreed that the closing could be pushed back to January 11" to give Defendant Priority One more time to complete the purchase of the homes. Dkt. 38 (Ex. 3) at 4.

[2] In support of this proposition, Defendant cites to the third paragraph of the settlement agreement. *See* Dkt. 38 (Ex. 2) ¶ 3. But that paragraph directly contradicts Defendant's argument—it states: "Priority One shall purchase the Etemadipour Family's properties for the purchase prices listed below, with closing to be completed *on or before January 11, 2024*." *Id.* (emphasis added).

Plaintiffs responded that the delay was "not acceptable," explaining that the settlement agreement "gave a date certain"—January 11, 2024. Dkt. 38 (Ex. 3) at 10. Consequently, Plaintiffs amended the purchase agreement to require a January 11, 2024 closing; they then signed the agreement and returned it. *See* Dkt. 38 (Ex. 5).

Not to be deterred, Defendant Priority One countered by scratching out the January 11th closing date and inserting a new date—February 15, 2024. *See id.* at 5. Only then did it sign the purchase agreement. *Id.* at 11.

Following further debate via email, *see generally* Dkt. 38 (Ex. 3), Plaintiffs ultimately filed the present motion to enforce the settlement agreement. Dkt. 37. In January 2024, the Court held a hearing on the motion. Dkt. 49. At the hearing, the Court discussed the issues the parties were having, *id.*, and thereafter, it directed the parties "to notify the Court within 48 hours of Priority One closing on *any* of the Etemadipour Family's homes," Dkt. 51 (cleaned up).

On February 2, 2024, Plaintiffs informed the Court that Defendant had closed on *one* of Plaintiffs' three homes, Dkt. 52, but this development did not end the dispute over the settlement agreement. Plaintiffs further apprised the Court that Priority One had, without Plaintiffs' consent, rescheduled the other two closings for May 1, 2024 and August 1, 2024.[3] *Id.*

---

[3] Defendant, for its part, explains "that due to the size of the loans [requested] and federal lending regulations [to which its lender is] subject [ ], the[ company's lender] would [only] allow Priority One to purchase one of the Plaintiff's [sic.] properties at a time, and the remaining purchases of the properties would need to be staggered, i.e., when one property sells, Priority One would be allowed to purchase another of Plaintiffs' properties." Dkt. 61 (Ex. B); *see also* Dkt. 61 (Ex. A). Defendant also contends that while "[i]t was the initial goal of the Defendant … to sell" the first purchased property quickly, Defendant has been unable to do so because "the property needed significantly more work than the Plaintiffs indicated." Dkt. 61 at 3.

At that point, Plaintiffs placed "the remaining two homes on the market in an attempt to mitigate their damages, but the homes have not sold."[4] Dkt. 54; Dkt. 66 at 54:7–55:15. In addition, May 1, 2024 has come and gone without Defendant closing on another of Plaintiffs' homes. Dkt. 54. Moreover, Defendant has not responded to Plaintiffs' inquiries into whether "defendant Priority One intend[s] to go forward with the remaining sales." *Id.* Supposedly due to Priority One's delay, Plaintiffs "were ultimately unable to purchase" one of the homes they had agreed to buy—1395 Wilson Drive—and had to "procure alternative financing in the form of a hard money loan to prevent loss of the" 203 Longhill Road property. Dkt. 68 at 4–5; Dkt. 63 (Pl. Ex. 45); *id.* (Pl. Ex. 23).

The Court has held a further hearing on Plaintiffs' motion to enforce the settlement agreement, Dkt. 62, and it is now prepared to partially resolve the motion.

## CONCLUSIONS OF LAW

As discussed above, when considering whether to enforce a settlement agreement, a "court should ascertain whether the parties have in fact agreed to settle the case," and, if they have, "the court must [then] discern the terms of that settlement." *Moore*, 936 F.2d at 162. However, in the present matter, because the parties acknowledge that they signed a binding

---

[4] Defendant contends that only one of the two remaining homes has been placed on the market. Dkt. 61 at 4. While it is true that only one of Plaintiffs' homes is listed on MLS—a database of properties for sale—both properties are being shown to potential buyers. Dkt. 66 at 54:7–55:15. Plaintiffs' real estate agent has agreed to sell both of Plaintiffs' homes. *Id.* at 52:16–20. And at the evidentiary hearing, he explained that, despite Plaintiffs wanting to list both properties, he had business concerns about doing so; specifically, he stated: "Josh Allen had the one at 1080 already on the market…. And so with having that already on the market at the time of listing 1072, and then to list 1060, all three in a row on the same side of the street with a street that only has 16 homes, I didn't feel like it was advisable to do so from a perception of buyers coming in to look at properties. It just didn't look, in my opinion, that good to have three in a row on the market." *Id.* at 54:18–55:3. Given this context, the Court determines that Plaintiffs are making a reasonable effort to sell both of their remaining homes—i.e., 1060 and 1072 Governor's Lane. They have, thus, taken reasonable steps to mitigate their damages.

settlement agreement, *see* Dkt. 38; Dkt. 43, the Court must simply "discern the terms of that" agreement.[5] *Moore*, 936 F.2d at 162.

### I. Defendant Priority One breached the unambiguous terms of the settlement agreement.

"A court's primary focus in considering disputed contractual language is to determine the parties' intention." *Pocahontas Min. Liab. Co. v. CNX Gas Co., LLC*, 666 S.E.2d 527, 531 (Va. 2008) (citations omitted). The parties' intent is most clearly reflected in the language of the contract, so the intent of the parties "should be ascertained, whenever possible, from the language the parties employed in their agreement." *Id.* Put differently, when a contract, "considered as a whole, is clear, unambiguous, and explicit, a court asked to interpret such a document should look no further than the four corners of the instrument." *Id.* However, there are times when contractual language is ambiguous. And "[w]hen the terms of a [contract] are ambiguous, a court will consider parol [—extrinsic—] evidence to ascertain the intent of the parties." *Video Zone, Inc. v. KF & F Properties, L.C.*, 594 S.E.2d 921, 924 (Va. 2004) (citations omitted). It is, therefore, significant whether language in a contract is ambiguous.

Relevant here, "[t]he mere fact that the parties disagree about the meaning of the contract's terms is not evidence that the contract language is ambiguous." *Pocahontas Min. Liab. Co.*, 666 S.E.2d at 531. Rather, language in "a contract is ambiguous if 'it may be understood in more than one way or when it refers to two or more things at the same time.'" *Video Zone, Inc.*, 594 S.E.2d at 923 (quoting *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 561 S.E.2d 663, 668 (Va. 2002)). "In determining whether … disputed terms are ambiguous, [courts] consider the

---

[5] The Court notes—and the parties agree—that the settlement agreement is a contract governed by Virginia law. *See* Dkt. 38 at 5; Dkt. 43 at 5. Therefore, normal principles of contract interpretation apply.

7

words employed in the contract in accordance with their usual, ordinary, and popular meaning." *Video Zone, Inc*, 594 S.E.2d at 924.

Here, the relevant contract language is unambiguous. The settlement agreement—the contract "expressing the entire understanding and agreement between the Parties," *see* Dkt. 38 (Ex. 2) ¶ 14—unequivocally states that Defendant Priority One was obligated to close on the Etemadipours' homes "on or before January 11, 2024." *Id.* ¶ 3. Because Priority One did not close on the Etemadipour Family's homes in time, the company is in breach of the settlement agreement.

Priority One's arguments to the contrary do not undermine this conclusion. Defendant primarily contends[6] that the parties "are now obligated by a subsequent agreement, the real estate purchase agreement which facilitates the sale of the properties and was endorsed by both Plaintiff and Defendant." Dkt. 43 at 4. While it is true that both parties ultimately endorsed this agreement, it, nonetheless, does not absolve Priority One of its obligation to close on Plaintiffs' homes by January 11, 2024. The reason is simple: there was not a meeting of the minds on a new closing date. When Plaintiffs signed the purchase agreement, they agreed to a closing date of January 11, 2024. Dkt. 38 (Ex. 5) at 5. Subsequently, Defendant scratched out that date and inserted a new one—February 15, 2024. *Id.* Plaintiffs never agreed to that new date and, therefore, cannot be bound by it.

> It is elementary that in order to form a contract, there must be no variance between the acceptance and the offer. A proposal to accept upon terms varying from those offered is a rejection of the offer and puts an end to the negotiations,

---

[6] Defendant Priority One also asserts that Plaintiffs cannot sustain an "action for anticipatory breach of the contract." Dkt. 43 at 4. But even if that were true—a point Plaintiffs contest, *see* Dkt. 46 at 3—"Priority One's breach is no longer anticipatory in nature." *Id.* The contractual date for closing on the Etemadipours' homes has passed; therefore, the pertinent question is whether Defendant actually breached the settlement agreement.

> unless the party who made the original offer renews it or assents to the modification suggested.

*Richeson v. Wilson*, 47 S.E.2d 393, 398 (Va. 1948); *see also Measell v. Baruch*, 147 S.E. 203, 204 (Va. 1929) (applying the same principle to real estate transactions). It follows that the settlement agreement has not been superseded, and the parties are, thus, still bound by it.

Because the parties reached a settlement agreement that unambiguously states that Defendant Priority One was required to close on the Etemadipour Family's homes by January 11, 2024 and since Defendant Priority One did not do so, the Court finds that Defendant Priority One is in breach of the settlement agreement.

## II. *Plaintiffs are entitled to monetary damages.*

Having determined that Defendant Priority One breached the settlement agreement, the Court must now ascertain the appropriate remedy. Plaintiffs, for their part, request either specific performance or damages. *See* Dkt. 38 at 6. But since the time for performance has already passed, the Court will focus solely on damages. In the end, the Court will exercise its inherent power to enforce the settlement agreement and order Defendant Priority One to pay monetary damages. *See Davis*, 701 F.2d at 308.

At this point, Plaintiffs have not sold the two remaining homes, and neither party has submitted persuasive evidence of those homes' market values.[7] Accordingly, the Court is unable to calculate the final quantum of damages at this time. Nevertheless, here, the Court will identify the general categories of damages to which Plaintiffs are entitled.

---

[7] The record relating to the homes' market values is underdeveloped. At the evidentiary hearing, they were discussed indirectly. *See, e.g.*, Dkt. 66 at 53:3–7. Indeed, no party appeared ready to adduce direct evidence of the homes' market values.

Plaintiffs are "entitled to be put in the same position as [they] would have been in if the contract had been performed." *United Virginia Bank of Fairfax v. Dick Herriman Ford, Inc.*, 210 S.E.2d 158, 160 (Va. 1974) (citing *duPont Co. v. Universal Moulded Prod.*, 62 S.E.2d 233, 253 (Va. 1950)). Therefore, they can recover those damages that "may fairly and reasonably be considered as arising naturally—that is, according to the usual course of things—from the breach of the contract itself, or such as may reasonably be supposed to have been contemplated by both parties at the time they made the contract." *Manss-Owens Co. v. H.S. Owens & Son*, 105 S.E. 543, 549 (Va. 1921).

Here, Plaintiffs request the following types of damages:

1. The purchase prices listed in the settlement agreement;
2. Homeowners' association dues, homeowners' insurance payments, property tax payments, mortgage payments, and utilities payments;
3. Loss of potential rent from the remaining properties; and
4. The costs associated with Plaintiffs' purchase (or attempted purchase) of other properties.

Dkt. 68 at 17–18. Plaintiffs may recover (1) the contract price of the remaining homes less their market value; (2) homeowners' association dues, homeowners' insurance, property taxes, mortgage payments, and utilities for the unsold homes; and (3) rent from 1072 Governor's Lane. At the same time, Plaintiffs may not recover the entire purchase price listed in the settlement agreement, rent from 1060 Governor's Lane, or losses they incurred in their efforts to buy other homes.

### 1. Plaintiffs are not entitled to the purchase price of their remaining homes. Instead, they may recover the contract price less the market value.

Plaintiffs first ask the Court to award them "the purchase price" of the homes—that is, $675,000 per home. Dkt. 68 at 8. They posit that, in this case, the correct "measure of direct

damages is the cost to complete the contract according to its terms."[8] *Id.* (quoting *TransDulles Ctr., Inc. v. USX Corp.*, 976 F.2d 219, 226 (4th Cir. 1992)); *see also* Dkt. 70 at 11–12 (citing *Bailey v. Clay*, 25 Va. 346 (1826) and *Turner & Happersett v. Hall & Connor*, 104 S.E. 861 (Va. 1920)).

Plaintiffs are incorrect. To be sure, the cost of completing a contract is sometimes the correct measure of damages. But that is generally not true in an action at law for breach of contract. *See McDaniel v. Daves*, 123 S.E. 663, 667 (Va. 1924) (declining to award the plaintiff the purchase price of real property because the case "was not a suit in equity for the specific performance of the contract, nor an action at law on the contract to recover the purchase money, but an action at law to recover damages for a breach of the contract"). Rather, "[t]he rule generally prevailing is that the measure of damages for a purchaser's refusal to perform a contract for the purchase of real estate is ordinarily *the difference between the contract price and the market value at the time of the breach*, with interest from the date of the breach, where the title remains in the vendor and the money in the purchaser." *Id.* (emphasis added) (collecting cases); *Little v. Cooke*, 652 S.E.2d 129, 144 (Va. 2007); *cf. Sandbeck v. Reyes*, No. 1:11-CV-0761, 2012 WL 928704, at *6 (E.D. Va. Mar. 19, 2012). It follows that Plaintiffs may recover the difference between the contract price and market value of the two homes.[9]

---

[8] Plaintiffs' position would authorize an impermissible double recovery. In essence, they invite the Court to allow them to keep their unsold homes *and* award them the purchase price of the same homes. The Court declines their invitation, noting that to accept it would put Plaintiffs in a far better position than they "would have been in if the contract had been performed." *United Virginia Bank of Fairfax*, 210 S.E.2d at 160.

[9] Defendant does not object to this formulation of contract damages. *See* Dkt. 69 at 11.

11

    **2. Plaintiffs are entitled to the money they have paid on homeowners' association dues, homeowners' insurance, property taxes, mortgage payments, and utilities following Defendant's breach.**

Turning now to whether Plaintiffs may recover the money they have expended on additional homeowners' association dues, homeowners' insurance, property taxes, mortgage payments, and utilities, the Court finds that they can. If a party delays in purchasing a home, the non-breaching party will still have to pay routine costs, such as homeowners' association dues, homeowners' insurance, property taxes, mortgage payments, and utilities. These payments are, consequently, all "damages which, in the ordinary course of human experience, can be expected to result" from the breach of a real estate contract. *Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.*, 214 S.E.2d 155, 160 (Va. 1975). Indeed, Defendant acknowledges as much. *See* Dkt. 69 at 6–7 (noting that "property taxes, utility costs, mortgage payments, and insurance costs" are "[d]amages which may be reasonably foreseeable in the 'ordinary course of human experience' with real estate purchase agreements"). There is little question that Plaintiffs may recover these types of damages.

    **3. Plaintiffs may recover rent for 1060 Governor's Lane but not 1072 Governor's Lane.**

Plaintiffs next request "the lost potential rental income … for each house." Dkt. 68 at 10. But they face a problem: only one of their two homes—1072 Governor's Lane—was being rented when the settlement agreement was ratified. *See* Dkt. 66 at 17:19–20:1; Dkt. 68 at 10. Therefore, rental income from 1060 Governor's Lane—i.e., the home that was not being rented—is speculative and, thus, unrecoverable. Plaintiffs have not explained why unrealized rent from a home that was never rented is a type of damage which "arise[s] 'naturally' or

'ordinarily' from a breach of contract."[10] *Roanoke Hosp. Ass'n.*, 214 S.E.2d at 160. Nor have Plaintiffs put forward any evidence to show that renting 1060 Governor's Lane was ever contemplated by the parties. *Id.* At bottom, Plaintiffs are not entitled to recover lost rents from 1060 Governor's Lane.

On the other hand, Plaintiffs may recover lost rents from 1072 Governor's Lane—the home that was being rented at the time the settlement agreement was executed. Plaintiff Mansour Etemadipour testified that the tenants at 1072 Governor's Lane "had wanted to move at the end of March," but due to the settlement agreement, Plaintiffs "asked them to move out early." Dkt. 66 at 24:23–25:4; *id.* at 22:23–23:3; *id.* at 47:3–7 (explaining that the tenants "had to move out" before Defendant Priority One purchased the home). Equally relevant, the settlement agreement prohibited Plaintiffs from making "new leases" or extending leases. Dkt. 42-1 at 3. Taken together, the evidence demonstrates that both parties understood, at the time of contracting, that Plaintiffs would be giving up significant rental profits from 1072 Governor's Lane by (1) forcing their tenants to leave early and (2) being precluded from making new leases or extending old ones. Given that this type of damage was contemplated by the parties, it follows that Plaintiffs can recover lost rents from 1072 Governor's Lane.

---

[10] True, Plaintiffs proclaim that "loss of rental income has been categorized as direct damages." Dkt. 70 at 16–17 (citing Dkt. 68 at 10). Yet, Plaintiffs do not explain how lost rent is a type of damage which "arise[s] 'naturally' or 'ordinarily' from" Defendant's breach of the settlement agreement. *Roanoke Hosp. Ass'n.*, 214 S.E.2d at 160. Moreover, the cases they cite in support of this proposition are inapposite to the case at hand. *See Tel. Square II v. 7205 Tel. Square, LLC*, 886 S.E.2d 269, 287–88 (Va. 2023) (implicitly treating lost rent as a form of consequential damages); *Sachs v. Hoffman*, 299 S.E.2d 694 (Va. 1983) (affirming an award of rent as compensation for property damage).

### 4. Plaintiffs cannot recover the costs associated with their attempted purchase of new properties.

Finally, Plaintiffs ask for the "costs associated with attempting to find new housing." Dkt. 68 at 12. They argue that "because [one of the Plaintiffs] resided in 1060 Governor's Lane," Defendant should have known that "compliance with the [Settlement] Agreement would require her to move out and find other housing." *Id.* Plaintiffs further contend that that they kept Defendant informed about their efforts to purchase new homes. *Id.*

However, Plaintiffs have failed to show that the purchase of any particular property using money from the unsold homes was contemplated by the parties when the settlement agreement was signed. "As a general rule, contemplation must exist at the time the contract was executed." *Roanoke Hosp. Ass'n.*, 214 S.E.2d at 160 (citations omitted). Important here, the only thing Priority One clearly knew at the time the settlement agreement was signed is that one of the Plaintiffs would need to move. Crucially, it did not appear to know what properties—if any— Plaintiffs intended to buy or how they planned on financing purchases.[11]

Thus, this case is akin to *Sandbeck v. Reyes*. There, the court noted:

> while defendants knew of plaintiff's plans to relocate to Florida … following the sale of the property at the time the Sales Contract was executed in November 2010, they did not know of plaintiff's intention to buy property in Florida or use any of the proceeds of the sale to finance the purchase of property in Florida until early March 2011. Thus, plaintiff's plan to finance the purchase of property in Florida with proceeds from the sale of the property to defendants was not within the contemplation of the parties at the time they executed the contract.

---

[11] It is true that Plaintiffs entered purchase agreements for their new properties before the settlement agreement was executed. *Compare* Dkt. 63 (Pl. Ex. 46) *and* Dkt. 63 (Pl. Ex. 22) *with* Dkt. 42-1 at 7–8. Nonetheless, Plaintiffs have pointed to no evidence indicating that Priority One was aware of these agreements at the time it signed the settlement. Indeed, the only evidence to which Plaintiffs cite is an email chain from weeks after the execution of the settlement agreement. *See* Dkt. 68 at 14 (citing Dkt. 50 (Pl. Ex. 5)). Such evidence will not do.

*Sandbeck*, 2012 WL 928704, at *7. The same is true here. Plaintiffs point to no evidence tending to show that Defendant knew of Plaintiffs' plan to purchase new properties with proceeds from the Governor's Lane homes. Consequently, Plaintiffs may not recover the expenses they incurred by buying—or attempting to buy—new homes.[12]

### CONCLUSION

For the foregoing reasons, the Court **FINDS** Defendant Priority One to be in breach of the settlement agreement. The Court further **FINDS** that Plaintiffs may recover the following types of damages: (1) the contract (settlement agreement) price of the remaining homes less their market value at the time of the breach; (2) the cost of homeowners' association dues, homeowners' insurance, property taxes, mortgage payments, and utilities on those homes; and (3) rent from 1072 Governor's Lane.

It is **SO ORDERED**.

The Clerk of Court is directed to send a copy of this Findings of Fact and Conclusions of Law to all counsel of record.

Entered this  2nd  day of August, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[12] This determination covers the damages Plaintiffs request in relation to the Wilson Drive property and the Longhill property. *See* Dkt. 68 at 18. However, the damages associated with the Longhill property—i.e., the hard money loan interest—is nonrecoverable for an additional reason: it is too remote. Even if Plaintiffs' plan to purchase the Longhill property was within the contemplation of the parties, Plaintiffs' decision to take out a hard money loan at 10% interest "cannot be considered a reasonably foreseeable consequence of defendants' breach." *Sandbeck*, 2012 WL 928704, at *7. This is particularly true since the record is silent about whether "[P]laintiff['s] explored alternative means of financing" the purchase. *Id.*